UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

REBECCA HOUSEL,

          Plaintiff,

v.

ROCHESTER INSTITUTE
OF  TECHNOLOGY, &
BARBARA  A. HEIFFERON, Individually,

          Defendant (s).
_____

**COMPLAINT**
Civ. No.:

## JURY TRIAL DEMANDED

## PRELIMINARY INTRODUCTION

1.    This is an action brought by the Plaintiff to redress retaliation for invoking her rights under the Family Medical Leave Act, ("FMLA") 29 U.S.C. § 2612 (a)(1). This is also an action for discrimination and retaliation under the Americans with Disabilities Act, ("ADA"), and the New York State Human Rights Law, §290, et. seq., ("NYSHRL").

## JURISDICTION AND VENUE

2.    Jurisdiction of  the Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. §2000e, 29 U.S.C. §§ 216 and 29 U.S.C. § 206.

3.    Venue is proper pursuant to 28 U.S.C. § 1391.

## PARTIES

4.   Plaintiff is an individual female who at all times relevant herein is a resident of the County of Monroe, State of New York.

5.   Plaintiff was employed by the defendant from September 2000 until March 18, 2009, and as such, Plaintiff has been employed by the defendant for more than one (1) year and had worked in excess of one thousand two hundred fifty (1,250) hours during the year preceding her termination/non-renewal of her annual contract on March 18, 2009.

6.   Upon information and belief, defendant ROCHESTER INSTITUTE OF TECHNOLOGY ("RIT" or "defendant") is a domestic corporation licensed to do business in the State of New York.

7.   Upon information and belief, Barbara A. Heifferon was, at all relevant times herein, the Chair of the English Department for the College of Liberal Arts, having been appointed as Chair in the summer of 2007 and is named herein as an "aider" and "abettor" under the NYSHRL.

8.   At all times relevant hereto, defendant has continuously engaged in an industry effecting commerce within the meaning of § 101(5) of the ADA. At all times relevant hereto, defendant has been a "covered entity" within the meaning of § 101(2) of the ADA, 42 U.S.C. §121112(2).

9.      Defendant is engaged in an industry affecting commerce and employs
        over fifty (50) or more employees for each working day during each of 20
        or more calendar workweeks in the current or preceding calendar year.

## ADMINISTRATIVE EXHAUSTION

10.     Plaintiff filed a charge of discrimination with the New York State Division of
        Human Rights and the Equal Employment Opportunity Commission. A
        Right to Sue Notice was issued by the Equal Employment Office on
        February 1, 2010.   Less than ninety (90) days have elapsed since the
        Plaintiff's receipt of that notice and her subsequent filing of the original
        complaint in this matter.

## FACTS

### 1. Background

11.     Plaintiff was hired by RIT in September 2000 as an extended part-time
        faculty member.

12.     At all relevant times herein, Plaintiff was a Lecturer, a non-tenure, annually
        renewable contracted professor within the Department of English.

13. Barbara A. Heifferon was, at all relevant times herein, the Chair of the English Department for the College of Liberal Arts, having been appointed as Chair in the summer of 2007.

14. In 1991, Plaintiff was diagnosed with a malignant brain tumor, inoperable at the time; in 2001, Plaintiff was diagnosed with cancer

15. Plaintiff was the only permanently disabled faculty member in her Department.

16. On December 5, 2007, Plaintiff had a meeting with Heifferon, per her request, where Plaintiff encountered verbal harassment regarding her medical condition and resulting handicap, including an anti-Semitic-toned conveyance of "suspicion" from other faculty regarding my "professionalism" as well as a threat to use legal measures against Plaintiff for applying to a tenure-track position.

17. On December 10, 2007, Plaintiff had a meeting with a senior tenured faculty member who was a member of the particular hiring committee for the tenure track position that Plaintiff had applied to within the department where it was conveyed that Plaintiff was "no longer under consideration" for the position, calling any future applications by Plaintiff "an uphill battle" and encouraging her to seek employment "elsewhere" because of this.

Page  -4-

18.    On approximately December 16, 2007, Plaintiff received an e-mail from
        Heifferon in which she cancelled of one of Plaintiff's classes for spring with
        no explanation,  and no response was received from Heifferon after
        Plaintiff's immediate reply with query about the cancellation.

19.    On January 24, 2008, Plaintiff has a  meeting in Heifferon's office where
        Heifferon questioned Plaintiff about Risi's proposal for independent study,
        implying Plaintiff had an inappropriate relationship with not just Risi, but
        others.

20.    Heifferon refused to discuss Plaintiff's merit review at this time.

21.    On January 30, 2008, Plaintiff meets Heifferon to discuss merit review;
        however, instead, Heifferon uses time to verbally harass Plaintiff using her
        medical condition and handicap

22.    At this meeting, Heifferon indicates concern that Plaintiff's students are
        more like "groupies" implying, again, that Plaintiff has inappropriate
        relationships with her students.

23.    On February 6, 2008, Plaintiff has a scheduled class visit with Heifferon;
        Heifferon does not show up, and does not contact Plaintiff with any
        explanation or request to reschedule this class visit.

24.   On February 13, 2008, Heifferon makes instead a "surprise" classroom
      visit, an hour into class time, interrupting student presentation and
      Heifferon is continuously disruptive through remainder of class, leaving
      without even speaking to Plaintiff.

25.   On February 16, 2008, Heifferon contacts Plaintiff on a Saturday via e-
      mail requesting a meeting for February 21, 2008—a non teaching day for
      Plaintiff and as such, a physical hardship—to discuss her observations of
      Plaintiff's class.

26.   On February 19, 2008, Plaintiff meets with Heifferon who indicates her
      own unpreparedness to have this meeting, even though the meeting was
      scheduled at her request, but continues to keep Plaintiff there, making
      negative and harassing comments about Plaintiff's medical conditions,
      disability, and threatening Plaintiff that the Dean Glenn Kist, pro-tem
      interim Dean, asked Heifferon to have Melissa Nicolas, Writing
      Coordinator, visit Plaintiff's class as well.

27.   This request was made one day before the end of the quarter. Heifferon
      indicates that Plaintiff needed to schedule a second meeting with her for
      February 21, 2008 to finally discuss class visit.

28.    On February 20, 2008, Nicolas visits Plaintiff's classroom; it is the last day
       of the quarter.

29.    On February 21, 2008, Plaintiff meets again with Heifferon; Heifferon
       began a litany of negative comments about Plaintiff calling her
       "frightening" and "dangerous," again, making inappropriate and harassing
       commentary on Plaintiff's medical condition, disability and relationship with
       male students.

30.    At this meeting, Heifferon also states that Nicolas agreed with her own
       (negative) assessments of the Plaintiff, her  medical condition, disability,
       and relationship with students.

31.    On February 25, 2008, Nicolas approaches Plaintiff after a committee
       meeting; Plaintiff asks her about her February 20, 2008 class visit, briefly
       referring to several of Heifferon's comments; Nicolas is concerned and
       denies agreement with Heifferon.

32.    On February 29, 2008, Heifferon leaves a message in Plaintiff's inbox
       including a "plan" for improvement of her teaching, which details an
       apparent need for twice weekly meetings with Heifferon and Nicolas,
       each. The "plan" also lists changes to the syllabus.

33.   On March 9, 2008, Heifferon sends Plaintiff an e-mail indicating "several
      e-mails sent" regarding the "plan," requesting that Plaintiff contact her for
      another appointment.

34.   Plaintiff sends her syllabi reflecting the requested changes on Heifferon
      "Plan" via e-mail for the new quarter which began the next day on March
      10, 2008.

35.   On March 11, 2008, Plaintiff goes to Heifferon's office to discuss meeting
      for the "plan;"  she is not there.

36.   On March 12, 2008,  Plaintiff receives an e-mail indicating that her travel
      plan was approved; Plaintiff however, is ill.

37.   Plaintiff's husband contacts the English Department secretary to inform
      them Plaintiff will be unable to teach on March 13, 2008.

38.   Plaintiff contacted students of the cancellation of the class through e-mail
      as well, with instructions for the next class to be held on March 18, 2008.

39.   On March 13, 2008, Plaintiff received a verbal offer from Buffalo State for
      a tenure track position.

40.   On March 15, 2008,  Heifferon sends Plaintiff an e-mail with an attached
      letter stating that she was not going to be "renewed" for Plaintiff's "non-
      response" to email.

41.   On March 16, 2008, Plaintiff composed a rebuttal to Heifferon's notice  of
      non-renewal, copying in interim Dean Kist.

42.   On March 18, 2008, Plaintiff speaks to  Mack—she brings up Plaintiff's
      travel approval, indicating there is a "problem" and that Heifferon withdrew
      her previous approval of Plaintiff's intended travel.

43.   On March 31, 2008, Plaintiff received an  e-mail response from Heifferon
      stating "many inaccuracies" in her rebuttal, and again asking Plaintiff to
      comply with the "plan" sent on February 29, 2008, even though Plaintiff
      already had made these syllabus changes and Heifferon herself never got
      back to Plaintiff about scheduling the a meeting to discuss the  "plan."

44.   Plaintiff responded to Heifferon by stating clearly and in good faith her
      concerns about her harassing behavior, stating the negative effects on her
      health, and also stating a possible need for outside assistance.

45.   On approximately April 2, 2008, Plaintiff received an email from interim
      Dean  Kist requesting a meeting to discuss Heifferon on April 3, 2008 with
      Human Resource Representative  Nancy Stoler-McDonald ("HR").

46.   Plaintiff agrees to attend this meeting.

47.   On April 3, 2008, Plaintiff meets with interim Dean Kist and HR; at this
      meeting, Plaintiff is accused of having a "problem" teaching (referring to a
      merit review done by Kist for 2003-2004 academic year though it was
      2008 and her previous merit review resulted in an "Outstanding" rank),
      repeatedly questioned, and forcedly kept there for two hours despite
      Plaintiff's obvious physical discomfort from sitting in one position for so
      long, given her disability.

48.   When Plaintiff asked interim Dean Kist about the letter of non-renewal for
      no more than a five day period during an absence on account of illness,
      Kist replied, "*I told her to write that letter, but only as a threat….*"

49.   On May 12, 2008, Plaintiff  received email notice late that afternoon from
      Kathleen Martin in HR that Plaintiff "must" meet with mediator Joe Brown
      the next day, May 13, 2008, at 4pm to discuss the previous
      correspondence with Heifferon.

50.     On May 13, 2008, Plaintiff met with Brown, which took place over the
        course of two hours in one of the offices in HR.

51.     Brown questioned Plaintiff incessantly for the first hour, and then reveals
        that he had interviewed "everyone" in her department about her.

52.     Brown informs Plaintiff that the consistent message from the collected
        faculty interviews was that Plaintiff was "hated" because her students
        respond positively to her teaching methods.

53.     Brown promises to try and resolve the situation. It is the last week of the
        spring quarter.

54.     On May 15, 2008, Plaintiff receives a merit review from Heifferon and
        interim Dean Kist; it lists a low level of rank, focusing on Plaintiff's
        application to a tenure track position as "promoting herself  within the
        Department," ignoring the Ph.D. conferred to Plaintiff during the period of
        review, an activity listed as worthy of "outstanding" rank in RIT policy and
        procedures on merit review evaluation.

55.     The merit review also conveys that Plaintiff needs to improve her teaching,
        which is a mystery, given Plaintiff's largely positive student evaluations
        during her eight years at RIT.

56. On July 9, 2008, Plaintiff received an e-mail from interim Dean Kist requesting a meeting the next day to "explain" results of investigation.

57. Plaintiff responded that she can meet any day on or after August 25, 2008.

58. In late July of 2008, Plaintiff received a letter from interim Dean Kist closing the investigation, citing "perceived harassment" on the part of all lecturers and adjuncts due to "new rigors" introduced by Heifferon.

59. Brown recommended mediation as a resolution, but this was never arranged by HR.

60. In late August of 2008, Plaintiff notes her schedule for the year does not include typical accommodations necessary for her winter mobility, as well as the inclusion of a fourth class for that quarter (which is not part of Plaintiff's contract).

61. Plaintiff contacted Heifferon, *inter alia*, regarding the discrepancy, restating the necessary accommodations required for improved winter mobility.

62.   Plaintiff received a response from Heifferon that they will not be
      addressing scheduling issues until fall quarter, though it is the official start
      of fall quarter already.

63.   Plaintiff contacted Linda Hill, a COLA scheduling officer, on the phone and
      she states that she does not know why Heifferon and/or Caschetta have to
      wait to address the discrepancy.

64.   On approximately September 16, 2008, Plaintiff receives an e-mail from
      Heifferon stating that "the same problems from spring" still exist and she
      needs to meet with her about the "plan" she outline in February 2008.

65.   Plaintiff replies, stating how the continuation of the harassment as
      referenced by "same problems from spring" are still having negative
      effects on Plaintiff's health; Plaintiff stated that if Heifferon wishes to meet,
      Plaintiff requests an outside mediator.

66.   On September 30, 2008, Rosh Hashanah, Plaintiff receives another e-mail
      from Heifferon indicating a need for quick response regarding her "plan"
      and also stating that Plaintiff can meet with her with the Deans as acting
      mediators, though this is highly irregular.

67.   Plaintiff informs Heifferon that it is a sacred Jewish holiday and that she
      has a right to observe it, copying in Dean Ulin and Capps.

68.   On October 8, 2008, after not hearing back from either Heifferon or the
      Deans, Plaintiff calls Dean Ulin's office and arranged for a meeting on
      October 14th to discuss the ongoing harassment from Heifferon.

69.   Plaintiff speaks to Ulin himself, who wishes Heifferon to be in the meeting,
      but Plaintiff clearly stated how she is not comfortable with that until the
      issues with Heifferon are properly addressed the issues concerning
      Plaintiff's medical condition, disability, and Jewish cultural ethnicity are
      resolved; Dean Ulin reluctantly agrees.

70.   On October 9, 2008, it is Yom Kippur, and Plaintiff has previously notified
      her classes that there will be no class meeting so Plaintiff may observe the
      holiday (this is also listed on the syllabus).

71.   This would be later referred to by Heifferon in Plaintiff's merit review for
      2008 as Plaintiff "having taken a personal day off" though it was clearly a
      high Jewish holiday and Plaintiff is a known Jew.

72.   This is part of Heifferon's continuing use of anti-Semitic sentiment,
      referencing her living in the "south for too long" in Department emails
      regarding an ignorance of major Jewish holidays like Passover and Yom
      Kippur.

73.   On October 13, 2008, Heifferon still has not addressed Plaintiff's need for
      accommodations in winter quarter or the strange addition of an extra
      class—though Plaintiff has addressed this in an e-mail about this in late
      August.

74.   On October 14, 2008, Plaintiff meets with HR representative Tammy
      Gouger at noon to discuss the ongoing issues with Heifferon.

75.   Plaintiff informs Gouger that she has a meeting with the Deans scheduled
      that afternoon; Gouger conveys with confidence that "she'll get to the
      bottom of this" and will get back to Plaintiff within a week;  Plaintiff never
      heard from Gouger again.

76.   Plaintiff meets with Dean Ulin, along with Dean Capps.

77.   Again, Plaintiff is repeatedly asked to give her "perception" of the problem.

78.   When Plaintiff continues to describe the situation with consistency, relating the March 15, 2008 letter of non-renewal for non-response to a single e-mail, the Dean asks "does this letter exist?"

79.   The meeting concludes with the Deans both promising to investigate and get back to Plaintiff.

80.   Plaintiff never hears back from either Dean regarding this matter.

81.   In mid-November of 2008, Heifferon sends Plaintiff an e-mail diminishing her courses and research by issuing a command that Plaintiff cut out significant components to her curriculum.

82.   Plaintiff responds with the same sentiments as previously conveyed over the course of the fall e-mail communications with Heifferon, including how much she is negatively affecting Plaintiff's health, requesting a mediator as per the investigator's report, and asking her to please stop, and copying in Deans Ulin and Capps, and the Provost.

83.   Since Plaintiff received this e-mail approximately one month after meeting with Deans Ulin and Capps, she assumes Heifferon was given leave by Ulin to send her the e-mail.

84. Plaintiff does not hear from any administrator or HR official regarding these good faith complaints.

85. On December 1, 2008, when bringing her merit materials to Heifferon's office at her request, Plaintiff is greeted with sarcasm in front of several other colleagues.

86. That same afternoon, another colleague, Elizabeth Mazzolini, passes Plaintiff on the ramp to the parking lot and calls Plaintiff a bitch" indicating joy that she is "leaving".

87. On December 8, 2008, Plaintiff began to have physical difficulty stemming from her brain injury from cancer treatments in 2001, due to the long-term sustained stress by the events of the last year as well as the current grueling schedule that was Heifferon's apparent response to Plaintiff's accommodation request for winter quarter: i.e. 3 back-to-back-to-back classes beginning at 8am—Plaintiff had no breaks, and even after only a week, felt the physical strain on her body.

88. At this juncture, Plaintiff is very worried that there is no help in sight from HR and/or as a result of her complaints to HR, or from any responsible RIT administrator, and that things will only continue to get worse.

Page -17-

89.    Plaintiff decides to begin to get information about the NYSDHR process.

90.    On December 10, 2008, Judy Offen, from the ffice next door to Plaintiff,
       asks Plaintiff to talk while standing in the doorway of her office; she tells
       Plaintiff that she heard Plaintiff was "leaving" and asked where she'd
       gotten another job.

91.    In mid-December 2008, Plaintiff files a charge of discrimination against
       Dean Kist, Barbara Heifferon and RIT to the NYSDHR.

92.    During this time, Plaintiff also receives another nomination for an
       "Eisenhart Award."

93.    Heifferon, as Chair was required to sign a form verifying Plaintiff's length
       of employment; Heifferon never produced the signed form.

94.    Early to mid-January 2009, Plaintiff submits her materials for the Eisenhart
       Award and travel approval request to both Dean Ulin and to Heifferon.

95.    The Eisenhart materials are due to the Award Chair, Carol Whitlock, by
       January 23rd.

96.   Linda Rubel also contacted Plaintiff and asked to visit a class; this is the
      third class visit in ten months.

97.   On January 13, 2009, Plaintiff receives an e-mail from Dean Ulin telling
      her that Heifferon has approved Plaintiff's travel request, though she never
      hears from Heifferon, or receives the signed form for her records.

98.   On January 20, 2009, Dean Ulin, Heifferon and Plaintiff communicate via
      e-mail regarding the Eisenhart Award form needing Heifferon's signature.

99.   Plaintiff at this time has applied to take the position of Andrea Walter, who
      announced her retirement, and a job description was circulated to faculty
      for a localized invitation to apply.

100.  On January 22, 2009, Plaintiff receives an e-mail from Dean Ulin stating
      Heifferon has stepped down as Chair due to "health reasons".

101.  This comes one week after Richard Santana is spontaneously appointed
      Department Co-Chair; Santana sends a follow-up e-mail listing
      departmental issues like "derision" as having been problematic, promising
      positive change during his Chair ship.

102.  On February 12, 2009, Plaintiff interviews with the hiring committee.

103.  By the end of February 2009, Plaintiff has completed all the classroom
      visits with Eisenhart committee members, including students; all have
      given Plaintiff positive reviews.

104.  The quarter is ending; Plaintiff expects to hear about the job she applied
      for in the next week.

105.  On February 27, 2009, the new staff assistant, Lisa Heyer  contacts
      Plaintiff about  scheduling Plaintiff's merit review with new Chair Santana
      on March 10th; Plaintiff agrees to the same.

106.  On March 2, 2009. Carl Atkins, Chair of the hiring committee, sends
      Plaintiff an e-mail conferring she was recommended to the Dean's office
      as a "finalist" for the job position she had applied for.

107.  On March 6, 2009, Plaintiff received an e-mail from Dean Capps informing
      Plaintiff  the job position is "no longer viable" and that she will not be
      receiving a final interview with Dean Ulin.

108.  On March 9, 2009, the new quarter has begun and Plaintiff's physical
      difficulties continued; Plaintiff contacts Sue Quinn in HR to learn of options
      if she becomes too sick to teach at some point.

109.  On March 10, 2009, Plaintiff meets with Chair Santana for her merit review
      and learn from Santana that Heifferon was *permitted* to write Plaintiff's
      merit review letter, and that Santana could "not change anything on the
      letter but grammar."

110.  Plaintiff and Santana go over the negative letter line-by-line.

111.  Plaintiff expresses her profound disappointment in the obviously skewed
      "review."

112.  Santana recommends Plaintiff craft a rebuttal.

113.  During Plaintiff's next class, she trips after unexpectedly losing feeling in
      her left side.

114.  Plaintiff is concerned her brain tumor has returned; Plaintiff calls Sue
      Quinn at HR.

115. On March 11, 2009, Plaintiff has even more severe neurological problems for the next twenty-four hours.

116. Plaintiff arranges for an emergency MRI.

117. Plaintiff completed the rebuttal of the negative review the afternoon before, dropping it off that morning at RIT.

118. On March 12, 2009, Plaintiff conducted her classes, even though she is having more difficulties than the day before; she trips in all three of her classes, almost falling.

119. On March 13, 2009, Dr. Korones called Plaintiff to tell her there it is best if Plaintiff took a medical leave for the remainder of the quarter.

120. Plaintiff contacted HR on March 13, 2009, to tell her what her doctor has recommended and to request leave under the FMLA.

121. Plaintiff contacted HR again on Monday, March 16, 2009, to give official notice to HR of her medical leave.

122.   Five days later, on March 18, 2009, on Plaintiff' receives a registered letter
       from RIT which states:

> [Plaintiff] is non-renewed for "insubordination" and a "lack of
> willingness to improve teaching" based on her last merit review with
> Heifferon.

123.   Defendant had no legitimate reason for the actions it took in terminating
       Plaintiff while out on FMLA leave and following, shortly in time, her good
       faith complaints of discrimination filed with the NYSDHR.

## FIRST CAUSE OF ACTION

### Violation & Interference with Plaintiff's Rights under the FMLA

124.   Plaintiff repeats and re-alleges by reference each and every allegation
       contained in  the above stated paragraphs and incorporates the same
       herein as though fully set forth.

125.   Defendant interfered with Plaintiff's rights under the FMLA.

126.   Plaintiff gave defendant  notice for the request for leave to care for a
       serious health condition on or about March 13,  2009.    Defendant
       sanctioned Plaintiff for exercising her rights under the FMLA by
       terminating her 5 days later on March 18, 2009.

Page  -23-

127.   The defendant used the taking of the FMLA by the Plaintiff as a negative
       factor in the employment action of terminating her *5 days* after she made
       her request for FMLA qualifying leave.

128.   Defendant's violations of the FMLA and the regulations which implement it
       constitute "interfering with" restraining and denying the exercise of
       Plaintiff's rights provided by the FMLA.   "Interfering with" includes
       manipulation by a covered employee such as the Plaintiff to avoid
       responsibilities under the FMLA.

## SECOND  CAUSE OF ACTION

### Retaliation  under the FMLA

129.   Plaintiff repeats and re-alleges by reference each and every allegation
       contained in the above stated paragraphs and incorporates the same
       herein as though fully set forth herein.

130.   Plaintiff engaged in protected activity when, on March 13, 2009, she in
       good faith requested leave under the FMLA.   Plaintiff was terminated in
       retaliation for her requests for leave under the FMLA a mere 5 days later.
       The termination of the Plaintiff by the defendant was casually related in
       that temporally, Plaintiff was terminated on March 18, 2009, 5 days after
       she had given notice of her intent to exercise her rights under the FMLA.

131.   As a direct and proximate result of Defendant's willful, knowing and intentional discrimination against her, Plaintiff has suffered and will continue to suffer pain and suffering and extreme and severe mental anguish and emotional anguish and emotional distress; she has incurred and will continue to incur medical expenses for treatment by health care professionals, and for other incidental expenses, and she has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities.   Plaintiff is hereby entitled to general and compensatory damages in amounts to be proven at trial.

132.   As a further and proximate result of Defendant's violations of the FMLA, Plaintiff has been compelled to retain the services of counsel in an effort to enforce the terms and conditions of the employment relationship with Defendants and each of them, and has incurred and will continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to the Plaintiff. Plaintiff requests that attorney fees be awarded.

## THIRD CAUSE OF ACTION

## VIOLATION OF THE ADA

133.  The above stated paragraphs are incorporated by reference as if fully set forth herein.

134.  By its conduct as set forth above, defendant has engaged in unlawful employment practices in violation of the ADA § 102(a), 102(b)(1), and 102(b)(5)(B), 42 U.S.C. § 121122(a), 12112(b)(1) and 12112(b)(5)(b). These practices include without limitation, refusing to provide plaintiff with reasonable accommodations for her known disabilities; retaliating against her for seeking reasonable accommodations, and terminating her employment as a result of her disabilities and/or perceived disabilities.

135.  These unlawful practices were intentional on the part of defendant and its management.

136.  These practices have caused plaintiff damages, deprived plaintiff of equal employment opportunities and otherwise adversely affected plaintiff because of her known disabilities.

## FOURTH CAUSE OF ACTION

## VIOLATION OF THE NYSHRL AGAINST ALL DEFENDANTS

137.   The above stated paragraphs are incorporated by reference as if fully set
       forth herein.

138.   By its conduct as set forth above, defendant has engaged in unlawful
       employment practices in violation of the NYSHRL, Executive Law § 290,
       *et seq.* These practices include without limitation, refusing to provide
       plaintiff with reasonable accommodations for her known disabilities;
       retaliating against her for seeking reasonable accommodations, and
       terminating her employment as a result of her disabilities and/or
       perceived disabilities.

139.   These unlawful practices were intentional on the part of defendant and its
       management.

140.   These practices have caused plaintiff damages, deprived plaintiff of equal
       employment opportunities and otherwise adversely affected plaintiff
       because of her known disabilities.

**WHEREFORE**, Plaintiff prays that judgment be entered in her favor and against

Defendants in accordance with the above stated causes of action.


Dated: March 30, 2010
Rochester, New York


*CHRISTINA A. AGOLA, PLLC*

/s/ Christina A. Agola, Esq.

_____
Christina A. Agola, Esq.

*ATTORNEY FOR PLAINTIFF*
2100 First Federal Plaza
28 East Main Street
Rochester, New York 14614
585.262.3320
585.262.3325
caa@wnycivilrights.com