UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

REBECCA HOUSEL,

                                        Plaintiff,

                                                            DECISION & ORDER
                                                            10-CV-6222FPG

v.


ROCHESTER INSTITUTE OF TECHNOLOGY and
BARBARA A. HEIFFERON,

                                        Defendants.

---

## I.   INTRODUCTION

Plaintiff Rebecca Housel ("Plaintiff") commenced this action alleging discrimination and retaliation under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2612(a)(1); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); the Americans with Disabilities Act, 42 U.S.C. § 12101 ("ADA"); and New York State Human Rights Law, § 290, *et seq.* ("NYSHRL"). Dkt. #1. In her Amended Complaint, Plaintiff asserts six Causes of Action alleging various acts of illegal retaliation on the basis of Plaintiff's disability, and refusing reasonable accommodations by Barbara A. Heifferon ("Heifferon") and other staff at Rochester Institute of Technology ("RIT") (collectively referred to herein as "Defendants") during the course of Plaintiff's nine-year employment at RIT. Dkt. #14.

Currently pending before the Court is the Defendants' Motion for Summary Judgment. Dkt. #22.

## II.   BACKGROUND

### A. Factual Background and Procedural History[1]

#### 1.   Plaintiff's Employment at RIT; Requests for Accommodations

Plaintiff was hired by RIT in September 2000, as a part-time Lecturer in the English Department.  Plaintiff notes that in September 2003, she was promoted to the position of full-time Lecturer.  Housel Aff. ¶2 (Dkt. #26).  Plaintiff was not employed in a tenured position and had an annual contract subject to renewal at RIT's option.

During the course of her employment from 2003 to 2008, Plaintiff requested accommodations from RIT due to her disability pursuant to the ADA, including being assigned to a classroom and office on the first floor of the building and having her classes scheduled two days per week.[2]  Those requests were granted.

#### 2.   Plaintiff's 2006-07 Annual Review; Plan for Improvement; Allegations of Harassment

In summer 2007, Heifferon was hired by RIT as the new Chair of the Department of English, the department in which Plaintiff worked.   As Department Chair, Heifferon's responsibilities included evaluating all teaching faculty and writing their annual merit reviews. In the fall of 2007, Heifferon prepared Plaintiff's 2006-07 Annual Review in which she rated Plaintiff as "satisfactory."  Heifferon stated in the review that she gave Plaintiff this rating with the understanding that Plaintiff would work diligently toward improving her teaching in writing in the upcoming spring quarter, based on a concrete plan for improvement.  Heifferon Decl., Ex. A (Dkt. #22-7).  Plaintiff disputes that there was any such understanding.  Housel Aff. ¶11.  The

---

[1] The following facts are undisputed, unless otherwise noted.

[2] Since 2001, Plaintiff has been diagnosed with a brain tumor, brain cancer, and Grave's disease, which results in hyperextension of the eye. She has used a wheelchair in the past, and occasionally uses a walker or a cane for assisted mobility. Am. Compl. ¶3.

2006-07 Annual Review contains many criticisms of Plaintiff's pedagogy, including syllabus issues and inappropriate use of class time. Heifferon Decl., Ex. A.

In January and February of 2008, Heifferon met with Plaintiff to discuss improvements needed to be made in her writing classes and to discuss Plaintiff's 2006-07 Annual Review. Heifferon Decl. ¶10. Plaintiff contends that during these meetings Heifferon, instead of discussing legitimate, work-related issues, began harassing Plaintiff about her disability, suggesting that Plaintiff was not truly disabled, did not have cancer, and did not require the use of a walker. Housel Aff. ¶¶7, 11; Clemens Decl., Ex. A (Housel Tr. 38).

On February 13, 2008, Heifferon observed one of Plaintiff's writing classes. Heifferon Decl. ¶11, Ex. B. Plaintiff contends that Heifferon's visit was conducted in a rude and disruptive manner, in that she arrived one hour into the class, interrupted a student presentation, and was critical of Plaintiff. Housel Aff. ¶12. Melissa Nicholas, Writing Director for RIT's English Department, also observed one of Plaintiff's classes on February 20, 2008. Shortly thereafter, Heifferon met with Plaintiff to discuss Nicholas' class observations. Heifferon Decl. ¶13. Plaintiff disputes the purpose of the meeting and states that they did not discuss the classroom observation and that instead, Heifferon made inappropriate and harassing remarks towards Plaintiff, including calling her "frightening," "dangerous," and suggested that Plaintiff had inappropriate relationships with her male students. Housel Aff. ¶16.

Heifferon sent Plaintiff a "Plan for Improvement on Writing Courses" ("Plan for Improvement" or "Plan") via e-mail on February 29, 2008. The Plan contained suggestions for Plaintiff's course content and assignments and recommended changes to the course syllabi. The Plan also provided for four class observations, two of which would be unannounced. Heifferon Decl., Ex. C. On March 9, 2008, Heifferon e-mailed Plaintiff requesting acknowledgement of Plaintiff's receipt of the Plan for Improvement. Heifferon Decl., Ex. D.

Housel states that she sent Heifferon an e-mail on March 9, 2008 containing a new syllabus and plan for the next quarter, incorporating Heifferon's proposed changes.  Housel Aff. ¶22.[3]

On March 15, 2008, Heifferon sent Plaintiff an e-mail, at the request of Glen Kist, Dean of the College of Liberal Arts ("Dean Kist") stating that non-renewal of Plaintiff's one-year teaching contract with RIT was being considered based on her failure to respond to the Plan for Improvement, or to Heifferon's e-mails dated February 29 and March 9, 2008.  Heifferon Decl. ¶16, Ex. E; Housel Tr. 127.  Plaintiff responded to this letter in a detailed, 5-page e-mail on March 16, copying in Dean Kist, in which she stated that she already submitted the proposed changes to the syllabi, expressed her dissatisfaction with Heifferon's criticism of Plaintiff's teaching methods, and accused Heifferon of "systematically harass[ing]" her in connection with her health problems.  Heifferon Decl., Ex. F.

On March 31, 2008, Heifferon replied to Plaintiff, stating that there were many inaccuracies in Plaintiff's March 16 letter, and asking Plaintiff to schedule a meeting with her to implement the Plan for Plaintiff's spring course.  Heifferon Decl. ¶18; Housel Aff. ¶30.  Plaintiff responded the same day, telling Heifferon that, as her supervisor, Heifferon was required to sufficiently answer all of Plaintiff's concerns regarding the alleged harassing and threatening behavior and its negative effects of her health.  Heifferon Decl. ¶8, Ex. H.  Plaintiff goes on to state that Heifferon never scheduled a meeting to discuss the Plan.  Housel Aff. ¶29.

On April 3, 2008, Dean Kist requested that Plaintiff meet with him and Human Resources Representative Nancy McDonald-Stoler.  Dean Kist reviewed the concerns expressed by Heifferon with respect to Plaintiff's teaching, and also explained that he had instructed Heifferon to send Plaintiff the March 15, 2008 letter advising of Plaintiff's possible non-renewal.

---

[3] Plaintiff's affidavit does not provide a reference to this e-mail, nor could the Court locate it within the voluminous exhibits submitted in connection with this matter.

### 3.   Internal Investigation

Because Plaintiff had complained about being harassed by Heifferon on the basis of her medical conditions, RIT launched an internal investigation, which was conducted by an external Human Resources consultant, Joseph Brown ("Brown").   Ulin Decl. ¶16, Ex. H; Housel Tr. 72. Plaintiff states that after she filed her internal grievance, Nancy McDonald-Stoler and Dean Kist assured Plaintiff that they would look into the situation.   Housel Aff. ¶31.   Plaintiff was advised of the results of that investigation, which found her allegations of a hostile work environment perpetuated by Heifferon uncorroborated.   Ulin Decl., Ex. H.   She goes on to state that she was informed that Brown had interviewed 23 members of RIT's Department of English faculty and staff, including herself and Heifferon, about the allegations in her grievance.   Housel Aff. ¶32. According to Plaintiff, Brown's report acknowledged conflicts between Plaintiff and Heifferon, and recommended mediation and remedial options to that end.   However, Plaintiff contends that RIT never implemented Brown's recommendations, and Heifferon's treatment of Plaintiff subsequently worsened.   Housel Aff. ¶33.

### 4.   Renewal for 2008-09 Academic Year; Further Allegations of Harassment

In May 2008, Plaintiff was sent a contract of renewal for the 2008-09 academic year, along with her 2006-07 Annual Review.   Housel Tr. 102-103, 173.   Plaintiff states that Heifferon gave her a "low" rating,[4] and erroneously focused on Plaintiff's application to a tenure-track position as "promoting herself [Plaintiff] within the Department," and ignored the Ph.D. conferred to Plaintiff during the period of review.   According to Plaintiff, a Ph.D. should have warranted an "outstanding" rank pursuant to RIT policy and procedures on a merit review application.   Housel Aff. ¶34.   Plaintiff also disagrees with Heifferon's remarks about Plaintiff needing to improve upon her teaching, as Plaintiff's student evaluations were overall positive

---

[4] The summary rating for this merit review was "satisfactory." Heifferon Decl., Ex. A.

during her eight years at RIT.  Housel Aff. ¶35.  Plaintiff believes that Heifferon did not accord the proper weight to Plaintiff's positive student evaluations, and notes that Plaintiff's previous merit reviews were "outstanding" in 2006 and "very good" in 2005.  *Id.*

On September 16, 2008, Heifferon sent Plaintiff an e-mail again requesting that she make changes to her syllabi for her fall quarter courses in accordance with the Plan for Improvement, and offered to meet with Plaintiff to discuss the changes.  Plaintiff sent an e-mail to Heifferon in response on September 18, 2008, stating that she was "uncomfortable with a meeting," in the absence of an "advocate of her choosing."  Plaintiff's e-mail further states that she wished to address the "negative implications" contained in her 2006-07 Annual Review, as well as the issues with the syllabi raised by Heifferon.  Heifferon Decl., Ex. I.

In an e-mail dated September 30, 2008, Heifferon responded that a meeting would be scheduled between Dean Robert Ulin ("Dean Ulin"), Senior Associate Dean John Capps ("Dean Capps"), Plaintiff, and Heifferon, so that both women would have witnesses and mediators present. Plaintiff replied that she was not amenable to meeting with Heifferon in the presence of the Deans, and preferred to bring an advocate of her choosing.  In the same e-mail, Plaintiff also requested that Heifferon send her the required changes with regard to her syllabus in writing.

On or about October 14, 2008, Plaintiff met with Deans Ulin and Capps and informed them that she wanted Heifferon's proposed changes to the syllabus to be done in writing, via e-mail.  Plaintiff tape-recorded this meeting.

On October 27, 2008, Heifferon sent Plaintiff the required syllabus changes by e-mail, at the request of Dean Ulin.

In an e-mail dated October 29, 2008, Plaintiff acknowledged that she had not followed up on Heifferon's Plan for various reasons, including that it was "part of the overall harassment." Heiferron Decl. ¶23, Ex. K.  Plaintiff went on to state that until an outside mediator was selected,

Plaintiff "[would] not be speaking with [Heifferon] further on any of this," that she "did not welcome further correspondence from [Heifferon]," and for Heifferon to stop contacting her because her e-mails were causing Plaintiff undue stress, loss of sleep, headaches, and decreased mobility. *Id.* Plaintiff also testified that she did not respond to Heifferon's e-mails, refused to meet with her, and advised Heifferon not to e-mail her with harassing comments. Housel Tr. 125.

### 5.  Complaint with  New York State Division of Human Rights ("NYSDHR")

On or about December 12, 2008, Plaintiff filed a complaint with NYSDHR, claiming that she was being discriminated against by RIT because of her disability or perceived disability. Clemens Decl. ¶8, Ex. A (Dkt #22-2); Housel Tr. 72.  Plaintiff explains that the charge named RIT, Heifferon, and Dean Kist, and that this was the second formal complaint she had filed against Heifferon relating to the alleged harassment and discrimination.  Housel Aff. ¶42.  On August 12, 2009, NYSDHR issued a Determination and Notice of Dismissal.

### 6.  2007-08 Annual Review; Application to Exploration Position; Subsequent Non-renewal/Termination

Sometime in December 2008, Heifferon completed Annual Reviews for several faculty members within the department for the academic year 2007-08.  Heifferon conducted Plaintiff's Annual Review, rating her performance as "unsatisfactory" because of Plaintiff's failure or unwillingness to implement certain changes to her syllabi and her writing classes, and because her classes continued to show fundamental problems that had been brought to Plaintiff's attention on previous occasions.  The Annual Review further noted that Plaintiff was insubordinate due to her refusal to meet with or communicate with Heifferon.  Heifferon Decl. ¶24, Ex. L; Ulin Decl. ¶13, Ex. F.  Plaintiff contends that Heifferon "volunteered" to write evaluations and only conducted seven, one of which was Plaintiff's, and had done so after she

had already stepped down as Chair of the English Department and after Plaintiff's NYSDHR complaint had been filed against Heifferon.  Housel Aff. ¶¶53, 56; Heifferon Tr. 95.

In January 2009, Heifferon stepped down from her position as Chair of the English Department at RIT, apparently for medical reasons.  Heifferon Decl. ¶¶28-29; Housel Aff. ¶55. According to Plaintiff, Richard Santana ("Santana") was "spontaneously appointed" as Department Co-Chair in January 2009.  Housel Aff. ¶48.

In February 2009, the College of Liberal Arts posted a job vacancy for the position of Chair/Director of the RIT "Exploration" Program.   Plaintiff states that she applied for the position in January 2009, was interviewed by the hiring committee Chair the same month, and interviewed a second time by the hiring committee in person in February 2009.  According to Plaintiff, she was advised by the Chair of the hiring committee by e-mail on March 2, 2009 that she was recommended as finalist for the position but was told by Dean Capps four days later that the position was "no longer viable" and that she would not be receiving a final interview with Dean Ulin.  Housel Aff. ¶¶ 48-49, 51-52.

Dean Ulin states that the search for the Director of the Exploration Program was university-wide, and that a candidate had been selected by the RIT Provost upon the recommendation of a search committee, of which he was not a member.  Ulin Decl. ¶19.

Plaintiff testified that she had no prior experience as the director of a university program, and that she did not know if or how the position was ultimately filled.  Housel Tr. 23-6.

On or about March 10, 2009, Plaintiff met with Santana to discuss her 2007-08 Annual Review, which had been prepared by Heifferon.  Plaintiff also tape-recorded this conversation. Plaintiff wrote a rebuttal to the Annual Review, dated March 11, 2009, which she sent to Dean Ulin.

Plaintiff was notified by letter on March 16, 2009, that she was not being renewed as a Lecturer for the 2009-10 academic year, based on poor performance and insubordination. The letter was sent from Dean Ulin. Plaintiff received this notification on March 18, 2009. The decision not to renew Plaintiff's contract was made on or before March 2, 2009, and Heifferon did not participate in the decision. Ulin Decl. ¶¶3, 15, 18.

### 7. FMLA Leave Request

Plaintiff's FMLA leave took place on March 18, 2009, after she submitted her application for leave to RIT's third-party administrator, UnumProvident ("Unum"). Plaintiff alleges that on March 9, 2009, she telephoned Susan Quinn ("Quinn"), Benefits Specialist at RIT, and told her that she was diagnosed with "exacerbation of neurological symptoms" from a previous brain tumor and inquired about her disability options. Plaintiff claims it was at this point that she gave RIT notice of her FMLA leave, and remained in contact with Quinn from March 9 to March 18, 2009. Housel Aff. ¶¶60-68. Specifically, that she phoned Quinn on March 13, 2009 to tell her that she required eight weeks of medical leave under the FMLA, and contacted her again on March 16, 2009. *Id.* ¶¶66-67. Plaintiff also e-mailed Quinn on March 18, 2009 regarding her FMLA leave, the same day she received her letter of non-renewal from RIT. *Id.* ¶¶68, 70.

Quinn did not receive notice from Unum approving Plaintiff's request until March 19, 2009, at which time she contacted Santana, Plaintiff's manager, to inform him of her FMLA leave, pursuant to the university's FMLA policy. At no time did Quinn contact Dean Ulin regarding Plaintiff's request for FMLA leave. Further, Defendants state that Heifferon had no authority to grant or deny Plaintiff a leave of absence for disability or under the FMLA, and did not participate in those decisions. Heifferon Decl. ¶31.

   8.   **Charge of Discrimination with Equal Employment Opportunity Commission ("EEOC"); Federal Proceedings**

Plaintiff filed a Charge of Discrimination with the EEOC on August 3, 2009, and was issued a Notice of Right to Sue on October 20, 2010.

Plaintiff commenced the instant action on April 20, 2010.  Dkt. #1.[5]  Defendants have moved for summary judgment on the basis that Plaintiff cannot establish the essential elements of her claims, and that any claims advanced against Heifferon in her individual capacity must be dismissed as a matter of law.  Def. Mem. (Dkt. #22-13, 12-32).  Plaintiff has opposed the motion. Dkt. ##24-27.  For the reasons that follow, the Court finds that Defendants are entitled to summary judgment, and the Amended Complaint is dismissed in its entirety.

## III.   DISCUSSION

### A. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  Regarding materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248.  More importantly, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

---

[5]   Although suggested in her Amended Complaint, Plaintiff does not assert discrimination or retaliation claims against Defendants on the basis of her religion. Housel Tr. 166-67; Am. Compl. ¶¶69, 71, 72.

Thus, the Court's function in deciding a summary judgment motion is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  When a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial. *Id* at 250.

As the Court observed in *Duse v. International Business Machines Corp.*, 252 F.3d 151, 158 (2d Cir. 2001), "[i]n assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." 252 F.3d 151, 158 (citing *e.g., Anderson*, 477 U.S. at 255).  However, "[i]f the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements of the claim become immaterial and do not suffice to defeat a motion for summary judgment." *Duse*, 252 F.3d at 158  (citing *e.g.*, *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Burke v. Jacoby,* 981 F.2d 1372, 1379 (2d Cir. 1992), *cert. denied,* 508 U.S. 909 (1993); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11-12 (2d Cir. 1986) (the existence of a factual issue will not suffice to defeat a motion for summary judgment where that issue is not material to the ground of the motion), *cert. denied,* 480 U.S. 932 (1987)).

**B. *McDonnell Douglas* Framework**

On a motion for summary judgment, retaliation claims are governed by the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*,  411 U.S. 792, 802–4 (1973).

First, a Plaintiff must establish a *prima facie* case of retaliation. To do so under Title VII, the ADA, FMLA and the NYSHRL, a plaintiff must show: (1) participation in a protected activity known to the defendant; (2) an adverse employment action; and (3) a causal connection

between the protected activity and the adverse action. *See Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996); *see also Perry v. NYSARC, Inc.*, 424 Fed. App'x 23, 2011 WL 2117950 (2d Cir. 2011) (citing *Holt* and applying the evidentiary standard developed in Title VII cases to cases under the ADA and FMLA); *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000) (applying the same standards to a retaliation claim under the ADA and NYSHRL).

Thereafter, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *Holt*, 95 F.3d at 129. If the defendant satisfies this burden, the plaintiff must present evidence that the articulated reason was a pretext for discrimination. *Id.* Specifically, a plaintiff must show that, "but-for" the protected activity, he or she would not have suffered the adverse employment action. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534 (2013).[6] The Court notes that "the but-for causation standard does not alter the plaintiff's ability to demonstrate causation at the *prima facie* stage on summary judgment or at trial indirectly through temporal proximity." *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 845 (2d Cir. 2013).

As an initial matter, the Court notes that the Amended Complaint asserts claims for unlawful interference with Plaintiff's rights under the FMLA. Am. Compl. ¶¶124-128. Plaintiff concedes in her opposition papers that she is not pursuing such a claim, and does not oppose dismissal. Pl. Mem. (Dkt #24, 21, n.2). Accordingly, the First Cause of Action alleging interference under the FMLA is dismissed.

Plaintiff has also failed to oppose Defendants' motion on the Third and Fourth Causes of Action alleging violations of the ADA and NYSHRL for RIT's failure to provide reasonable

---

[6] The Supreme Court recently clarified that "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer," as distinct from "a motivating factor," which had previously been the standard in the Second Circuit. *Nassar*, 133 S.Ct. 2517 at 2534; *see Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006).

accommodations.[7] Am. Compl. ¶¶133-140.  As a result, these claims are deemed abandoned and are dismissed on this motion.  *See Hanig v. Yorktown Cent. Sch. Dist.*, 384 F. Supp. 2d 710, 723-24 (S.D.N.Y. 2005).

Plaintiff does oppose the dismissal of her claims of retaliation under the FMLA, ADA, Title VII, and NYSHRL, therefore the Court will determine whether any triable issues of fact exist with regard to those claims brought under the First, Second, Third, Fifth, and Sixth Causes of Action.

For purposes of this motion, the Defendants do not dispute that Plaintiff is a disabled individual and that she engaged in protected activity within the meaning of the relevant statutes.

Plaintiff contends that she suffered adverse employment actions when:  (1) Heifferon gave Plaintiff an unsatisfactory merit review in December 2008; (2) RIT refused to consider Plaintiff for the Director of the Exploration position in March 2009; and (3) Plaintiff was terminated by RIT in March 2009.  Pl. Mem. 18.  In the interest of judicial economy, the Court assumes that all three incidents constitute adverse employment actions for purposes of Plaintiff's retaliation claims.  The only question that remains, then, is whether Plaintiff can show a causal connection between her protected activity and the adverse employment actions alleged here.

## C. Retaliation under FMLA (Second Cause of Action)

In her Amended Complaint, Plaintiff claims that she engaged in protected activity when she requested FMLA leave on March 13, 2009, and was terminated in retaliation five days later. Am. Compl. ¶130.  Defendants contend Plaintiff's claim fails because she fails to adduce sufficient evidence to support her claims.  Def. Mem. 16-18.  The Court agrees that Plaintiff's claims are unsupported.

---

[7] The Third and Fourth Causes of Action also advance claims of retaliation; however they are identical to those set forth in the Fifth and Sixth Cause of Action, which are thoroughly addressed in this Decision and Order, *infra.*

1.    *Prima Facie* **Case**

As stated earlier, retaliation claims brought pursuant to the FMLA are analyzed under the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Roberts v. Health Ass'n*, 308 Fed. App'x 568, 570 (2d Cir. 2009); *see also Potenza v. City of New York*, 365 F.3d 165, 167–68 (2d Cir. 2004) (per curiam). Pursuant to the *McDonnell Douglas* framework, the burden is initially on plaintiff to prove a *prima facie* case. *See McDonnell Douglas Corp.*, 411 U.S. at 802.

To establish a *prima facie* case of FMLA retaliation, Plaintiff must show that (1) she exercised rights protected under the FMLA, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *See Potenza*, 365 F.3d at 168. The parties disagree that Plaintiff's termination was retaliatory in nature.

Plaintiff alleges that she spoke with Quinn, the Benefits Specialist at RIT, to inquire about taking FMLA on several occasions between March 9 and March 16, 2009. Am. Compl. ¶¶120-121; Pl. Mem. 22. Plaintiff's letter of non-renewal was dated March 16, 2009, and she received said letter on March 18, 2009. Housel Tr. 73-74. Plaintiff argues that such close temporal proximity gives rise to an inference of retaliation by RIT because Plaintiff exercised her FMLA rights and RIT was on notice of that. Pl. Mem. 24.

Dean Ulin states that although Plaintiff's non-renewal letter was dated March 16, 2009, he had actually made the decision not to renew Plaintiff's contract as a Lecturer at RIT on or before March 2, 2009—one week before Plaintiff's initial phone call to Quinn and 17 days before Plaintiff's leave was approved. Ulin Decl. ¶18, Ex. A. Ulin Decl. ¶¶15, 18.

Plaintiff contends that an issue of fact exists as to when Dean Ulin was made aware of her FMLA leave, stating that she contacted Quinn in the HR Department of RIT as early as

March 9, 2009, to inquire about her disability options.  Housel Aff. ¶60.  Plaintiff submits her sworn affidavit to support the assertion she called and e-mailed Quinn repeatedly from March 9 to March 18, 2009.  *Id.* ¶¶60-68.

In response, Quinn states that she "vaguely remember[s] that Plaintiff contacted [her] at some point to inquire about FMLA leave," but has no recollection of the specifics of that communication.  An e-mail dated March 10, 2009, indicates that Quinn advised Plaintiff to call Unum to report her absence and get the disability paperwork.  Housel Decl., Ex. K.

Quinn goes on to state that as a matter of practice, she did not inform an employee's manager of leave until she received notification by Unum, RIT's third-party benefits provider, that Plaintiff's leave had been granted.  When Quinn did receive notice from Unum on March 19, 2009, she contacted Santana, Plaintiff's manager, to advise him of Plaintiff's FMLA leave.  She did not speak with Dean Ulin at any time regarding Plaintiff's request.  Quinn Decl. ¶¶10-12.

Thus, even assuming Plaintiff did have e-mail and telephone conversations with Quinn regarding leave inquiries only days before her termination, this does not create a causal connection between Plaintiff's FMLA leave status and Dean Ulin's decision to not renew her contract for the upcoming school year, as Plaintiff does not submit, nor can the Court locate, any evidence from which a jury could infer Dean Ulin knew that Plaintiff requested FMLA leave.  This is fatal to Plaintiff's claim of retaliation.  *See Shah v. Eclipsys Corp.*, No. 08–CV–2528, 2010 WL 2710618, *12 (E.D.N.Y. July 7, 2010) ("The fact that the relevant decision maker was unaware that plaintiff had requested FMLA leave undercuts any argument that retaliatory intent was behind the decision to fire plaintiff.") (citing *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 800 (11th Cir. 2000)).

It is also worth noting Plaintiff was made aware that her job was already in jeopardy as early as March 2008, a year prior to her application for FMLA leave, when she was notified by

e-mail that non-renewal of her annual teaching contract would be considered based on her failure to respond to Heifferon's Plan for Improvement. Heifferon Decl., Ex. E. Prior discipline can negate the temporal-proximity inference. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

### 2.   RIT's Proffered Reason

In any event, even if Dean Ulin foresaw that Plaintiff would be applying for FMLA leave, Defendants provide a legitimate reason for non-renewal of Plaintiff's contract: insubordination and poor performance.

Plaintiff's 2006-07 Annual Review rated Plaintiff as "satisfactory with the understanding she will work diligently toward improvement of her teaching and writing in the spring quarter of 2008." Heifferon Decl. ¶9, Ex. A. The merit review indicated that Plaintiff provided coursework that was not appropriate at the collegiate level, showed too many movies in class, allowed too much time for student presentations, and did not leave enough time for writing. *Id.* Additionally, Heifferon noted that most of Plaintiff's students expected to receive "A" grades, and several student evaluations referred to the class as "fun," raising issues, in Heifferon's mind, of whether Plaintiff's coursework was sufficiently demanding.[8] *Id.* Finally, Heifferon pointed out that Plaintiff had initiated a public website for a yet-to-be-approved science writing program with her name and credentials associated with it. At that time, Plaintiff had no apparent connection to the forthcoming program, and Heifferon perceived Plaintiff's website as an inappropriate attempt to "promot[e] herself within the English Department." *Id.*

---

[8] Plaintiff submits several positive student evaluations in support of her opposition to the Defendants' motion for summary judgment. The evaluations provided indicate that Plaintiff's class was, among other things, "fun," "a good time," and "enjoyable." While this evidence certainly indicates that Plaintiff was a well-liked lecturer, it is not necessarily inconsistent with Heifferon's observations. Housel Decl., Ex. C.

In February 2008, shortly after Plaintiff's 2006-07 Annual Review was issued, Heifferon observed a non-fiction writing class in which she noted that "students literally asked for feedback on the writing and were not given any," that she could not find a "clear, educational objective" in the student presentations, and that one student characterized the course as at a "middle-school" level in an evaluation. Heifferon Decl., Ex. B.

On February 29, 2008, Plaintiff was given a Plan for Improvement with instructions on how to improve her course content and teaching methods. Two weeks later, Plaintiff was issued a letter threatening non-renewal for her failure to comply with the Plan and her non-response to Heifferon's e-mails. Heifferon Decl., Ex. E.

Plaintiff's subsequent merit review in December 2008 was rated "unsatisfactory" on the basis of negative student evaluations, continuing problems with the course syllabus, Plaintiff's failure to attend the Writing Director's workshops, and lack of professionalism. Heifferon Decl. ¶24, Ex. L. The evaluation stated,

> She has been insubordinate, refusing to meet with the Chair of the department, unwilling to receive e-mail and unwilling to improve her teaching of writing. She was offered mentoring and a concrete plan to improve her writing courses by both the former Director of First-Year Writing and the Department Chair. She did not accept the plan and refused to work with her direct supervisors.

*Id.* Heifferon's criticisms of Plaintiff's teaching methods echoed those in the previous year's merit review, as well as those in her classroom observation dated February 13, 2008. Heifferon Decl., Ex. B.

Accordingly, Defendants have satisfied their burden of production at this stage of the burden-shifting analysis. *See E.E.O.C. v. Town of Huntington*, No. 05–CV–4559, 2008 WL 361136, at *7 (E.D.N.Y. Feb. 8, 2008) ("Because poor job performance constitutes a legitimate, nondiscriminatory reason, Defendants have satisfied their burden of production.").

### 3.     Pretext

Plaintiff, on the other hand, adduces no evidence to demonstrate that the reason for her non-renewal was pretext for retaliation for filing for FMLA leave.  Again, assuming that Dean Ulin knew of Plaintiff's application for FMLA leave prior to his decision not to renew Plaintiff, the only support for her retaliation claim is the temporal proximity between the two events.  This, by itself, is insufficient to establish pretext.  *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("without more, such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext."); *Colombo v. East Irondequoit Cent. Sch.*, No. 07–CV–6270, 2010 WL 6004378, *14 (W.D.N.Y. Dec. 17, 2010) ("[T]emporal proximity, standing alone, is insufficient to create a triable issue of fact as to pretext.") (citing *Simpson v. N.Y.S. Dep't of Civil Servs.*, 166 Fed. App'x 499, 502, 2006 WL 93011 at *2 (2d Cir. Jan. 9, 2006) ("While the temporal proximity of these events gives rise to an inference of retaliation for the purposes of appellant's *prima facie* case, without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext.") (unpublished, citation omitted)).

In sum, Plaintiff has produced no evidence from which a jury could rationally find that Defendants discriminated against her in retaliation for her taking FMLA leave.  The Court therefore grants Defendants' motion for summary judgment with regard to her claims arising under the FMLA.

### D.  Retaliation under ADA and NYSHRL (Third and Fourth Causes of Action)

### 1.     *Prima Facie* Case

Plaintiff  next  claims  that  RIT  retaliated  against  her  for  seeking  reasonable accommodations for her disability by: (1) terminating her employment; (2) giving her a negative

performance review; and (3) failing to consider her for the Director of the Exploration Program at RIT. Am. Compl. ¶¶134, 138; Pl. Mem. 24-25. [9]

Having satisfied the first three elements of her *prima facie* case, the Plaintiff must now show that a causal connection exists between the adverse action and the protected activity. "[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). Here, she fails to do so and, therefore, does not state a *prima facie* case of retaliation.

Plaintiff appears to base her ADA and NYSHRL retaliation claims on her requests for reasonable accommodations between the fall of 2003 and the fall of 2008. [10] Those requests were made, at the very least, six months prior to the termination of her contract on March 16, 2009, at most several years. Housel Tr. 48-51. Likewise, her failure to be considered for the Exploration position occurred approximately six months after her request for accommodations. *Id.* 26. Finally, the temporal proximity between her latest request for accommodations and her unsatisfactory Annual Review was roughly two to three months. Heifferon Decl., Ex. A.

Though the Second Circuit "has not drawn a bright line defining, for the purposes of a *prima facie* case, the outer limits beyond which a temporal relationship is too attenuated to establish causation," it has held a causal relationship existed where as many as five months has lapsed between the protected activity and an employee's termination. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). That said, claims of retaliation are routinely

---

[9]  As stated earlier, Plaintiff's claims that Defendants refused to provide Plaintiff with reasonable accommodations for her known disabilities have been deemed abandoned.
[10]  It is undisputed that all of Plaintiff's requests for reasonable accommodations, including a first-floor classroom, a first-floor office, and a two-day schedule, were granted by RIT. Housel Tr. (Clemens Decl., Ex. G) 48-51.

dismissed when as few as three months elapse between the protected activity and the alleged act of retaliation. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (citing with approval cases dismissing retaliation claims where adverse employment action followed protected activity by three to four months); *Hollander v. American Cyanamid Co.*, 895 F.2d 80 (2d Cir. 1990) (finding a lack of evidence that an adverse action, taken three months after the plaintiff's EEOC complaint, was in response to the plaintiff's protected activity). Thus, even applying the latest possible date, Plaintiff has not established sufficient temporal proximity to support an inference of a causal nexus between her request for accommodations and her failure to be considered for the Exploration position and subsequent termination. *See Wojcik v. Brandiss*, --- F.Supp.2d ---, 2013 WL 5407208 (E.D.N.Y. 2013) (span of nearly six months between employee's complaints to program director about supervisor and incident that led to termination precluded temporal proximity sufficient to support retaliation claim).

Similarly, the lapse of two to three months between her request for accommodations and her unsatisfactory merit review in December 2008 is also insufficient temporal proximity in the absence of any other evidence of causation. *See Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 456–58 (S.D.N.Y. 2012) (three-to-six-month gap insufficient to establish causal connection); *see also Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) ("district courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation"); *Deebs v. Alstom Transp., Inc.*, 550 F. Supp. 2d 38 (W.D.N.Y. 2008) (citing *Murray, supra*).

Plaintiff argues that she has submitted proof of causation by the "clear animus Heifferon displayed towards her" in the form of derogatory comments about Plaintiff's medical conditions. Pl. Mem. 18.

The comments made by Heifferon, characterized by Plaintiff as implications that she was "faking" her impairments, are not particularly probative of an actual *causal link* between the Plaintiff's requests for accommodations and the alleged adverse employment actions.  Taking the evidence in Plaintiff's favor, Heifferon's derogatory comments were made, followed by a negative performance review and Plaintiff's termination, but Plaintiff has not tied those events together.  Stated another way, Plaintiff fails to present evidence that the adverse employment actions she suffered were causally related to Heifferon's remarks, which were made outside of the context of Plaintiff's request for accommodations.  *Compare Johnson v. Cnty. of Nassau*, 480 F. Supp. 2d 581, 599–600 (E.D.N.Y. 2007) (concluding that a comment by plaintiff's supervisor was a "stray remark" that was "insufficient to raise an inference of discrimination because there [was] no nexus between his remark and any of the alleged adverse acts"); *with Rose v. N.Y. City Bd. of Educ.*, 257 F.3d 156, 158, 162 (2d Cir. 2001) (in ADEA action, employer's comments to plaintiff that he would replace her with someone "younger and cheaper" if she didn't follow his instructions was evidence of retaliatory animus).  There is therefore no issue of fact as to whether Plaintiff's requests for accommodations were the "but-for" cause of her adverse employment actions.[11]

As is discussed at length throughout this Decision and Order, there is no evidence that Plaintiff received an unfavorable merit review for any other reason other than her professional shortcomings.  Significantly, Plaintiff acknowledges that her multiple requests for accommodations were routinely granted by RIT.  Heifferon, after taking over as Chair, saw to it that Plaintiff's requests were met.  Clemens, Decl., Ex. A (e-mails dated 8/20/2008 to

---

[11] The Second Circuit has not yet articulated what standard now applies for ADA retaliation claims, however Plaintiff's claim would fail under either standard. Prior to *Nassar*, the Second Circuit held that a plaintiff may meet her burden by "point[ing] to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation," *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001), by "com[ing] forward with evidence establishing that it is more likely than not the employer's decision was motivated, at least in part, by an intent to retaliate against him." *El Sayed*, 627 F.3d at 932.

8/25/2008). Evidence to the contrary would be relevant to Plaintiff's *prima facie* case, however, no such evidence exists on this record.

Having failed to make out a *prima facie* case, the Court finds that Defendants are entitled to summary judgment on Plaintiff's retaliation claim based on her requests for reasonable accommodations under the ADA and NYSHRL.

### E.  Retaliation under Title VII and NYSHRL (Fifth and Sixth Causes of Action)

Plaintiff's Fifth and Sixth Causes of Action assert claims of retaliation pursuant to Title VII and NYSHRL based on her filing of: (1) an RIT internal grievance against Heifferon in April 2008; and (2) a verified complaint with DHR in December 2008. Am. Compl. ¶¶142, 152.

Title VII forbids an employer from discriminating against "any individual" based on that individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). In both of Plaintiff's complaints, she claimed that she was being discriminated against on the basis of her medical condition. The Court observes that courts in this Circuit have held that disability is not a protected category under Title VII. *See Rich v. Assoc. Brands, Inc.*, 379 Fed. App'x 78, 80, n.1 (2d Cir. May 28, 2010) ("Title VII ... protects against discrimination based on an 'individual's race, color, religion, sex, or national origin,' but not disability.") (citation omitted); *see also Santucci v. Veneman*, No. 01 CIV. 6644, 2002 WL 31255115 at *3 (S.D.N.Y. Oct. 8, 2002) ("[T]he protected activity alleged [in a Title VII retaliation case] must involve some sort of complaint about a type of discrimination that Title VII forbids.") (citation omitted); *Male v. Tops Markets*, LLC, No. 09–CV–6352, 2011 WL 2471449, *10 (W.D.N.Y. Jun 22, 2011) (expressing doubt that complaints about disability discrimination could form the basis for a Title VII retaliation lawsuit) (citing *Rich* and *Santucci*, *supra*).

In any event, Plaintiff's complaints can certainly form the basis of a retaliation claim under NYSHRL, which explicitly proscribes discrimination based on disability.[12] As noted earlier, "the standards for proving discrimination under Section 296 of the New York Executive Law are the same as under Title VII." *Lucas v. South Nassau Cmtys. Hosp.*, 54 F. Supp. 2d 141, 146 (E.D.N.Y. 1998) (citing *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 479 (1982); *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993) (plaintiff's claim under New York's Human Rights Law "is governed by the same standards as his federal claim")).

Under Title VII and the NYSHRL, "[t]o make out a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013).

Here, Plaintiff fails to state a *prima facie* case of retaliation, and, in any event, fails to establish that her protected activities were the "but-for cause" of the alleged adverse actions discussed below.

1.   ***Prima Facie* Case**

a. **Failure to Consider Plaintiff for Exploration Position**

With regard to Plaintiff's claim that she was "subject to the failure to promote and loss of other job opportunities," when she was not selected for the Exploration position in March 2009,

---

[12] New York Executive Law § 296 provides in pertinent part as follows:

> It shall be an unlawful discriminatory practice . . . [f]or an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

N.Y. Exec. L. § 296(1) (McKinney's 2010).

*see* Am. Compl. ¶144; Pl. Mem. 18, she provides no more than vague and conclusory statements as to why she was not selected for the position. This alone is insufficient to survive summary judgment. *See, e.g., Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) ("Even in the discrimination context ... a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment.").

Defendants state that the position was university-wide, and that a candidate was selected by the Provost at the recommendation of a search committee, of which neither Dean Ulin nor Heifferon were members. Ulin Decl. ¶19.

Plaintiff, on the other hand, produces no evidence to show that the person selected for the position was less qualified than she was, has no knowledge of the identity or qualifications of that individual as compared to her own qualifications, and Plaintiff's own testimony establishes that she had no prior experience as a director of a university program. Housel Tr. 23-24. In her sworn affidavit, Plaintiff recalls being interviewed for the position, and later receiving an e-mail from Dean Capps informing Plaintiff that the position was "no longer viable." Housel Aff. ¶52. This does not conflict with Dean Ulin's explanation or give rise to an inference of retaliatory animus.

In any event, Plaintiff was selected to, and did interview for the position *after* she filed both her internal complaint and her complaint with NYSDHR, thus negating any inference that RIT was retaliating against her for engaging in protected activity. *See, e.g., Dayes v. Pace Univ.*, 2 Fed. App'x 204 (2d Cir. 2001) (period of approximately seven months between employee's complaint about supervisor's conduct and his negative review, especially given his intervening positive review, defeated employee's attempt to establish a causal connection between the two events, for purposes of a retaliatory discharge claim). Plaintiff's *prima facie* case on the basis

that she was not offered the Exploration position in retaliation for her complaints of disability discrimination therefore fails.

### b. Unsatisfactory Merit Review and Non-renewal/Termination

Plaintiff filed her NYSDHR complaint on December 12, 2008, three months prior to her termination letter dated March 16, 2009. Plaintiff's 2007-08 Annual Review, which formed the basis for Plaintiff's non-renewal letter, was prepared sometime in December 2008, yet the record is unclear as to the precise date. Resolving all ambiguities in Plaintiff's favor, the Court finds that the close temporal proximity supports a causal connection for purposes of her *prima facie* case. *See, e.g., Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208 (2d Cir. 2001) (employee established causal connection between her EEOC charge and her suspension by showing that she was suspended in same month that employer was served with charge.)[13]

### 2.    Defendants' Proffered Explanation

In the next step of the *McDonnell Douglas* analysis, the Court must determine whether Defendants have proffered a legitimate, non-discriminatory reason for Plaintiff's unsatisfactory Annual Review, which ultimately led to her termination from RIT.

Plaintiff's 2006-07 Annual Review, for which she received a rating of "satisfactory," outlined several concerns and criticisms regarding Plaintiff's teaching abilities and methods. This review was prepared sometime in December 2007 and issued on February 11, 2008, pre-dating Plaintiff's NYSDHR complaint by approximately ten months. Those concerns included dedicating too much class time to showing films, student presentations, and conducting conferences, and not enough time spent instructing in the area of writing. Heifferon Decl. ¶9,

---

[13] To the extent Plaintiff relies on her internal complaint to RIT to support her retaliation claim, such an argument must also fail. *See* Pl. Mem. 18. In April, 2008, Plaintiff filed a grievance with RIT regarding Heifferon's alleged conduct toward her. Housel Tr. 35; Pl. Mem. at 18. An investigation into that matter commenced May 7, 2008, Ulin Decl., Ex. H.; Pl. Mem. 18, and her contract to teach for the 2008-09 academic year was renewed May 15, 2008. *See* Am. Compl. ¶ 54. The internal complaint cannot form the basis of Plaintiff's retaliation claim as the requisite causal connection is broken by an intervening positive event. *See Dayes, supra.*

Ex. A.  A subsequent classroom observation in February 2008 raised questions as to whether Plaintiff's course content was sufficiently challenging, reinforcing Heifferon's concerns enumerated in the previous merit review.  Heifferon Decl., Ex. B.

Later that month, Plaintiff was presented with a Plan for Improvement for her writing courses, which required changes to her course syllabi and twice-weekly meetings with Heifferon and the Director of the Writing Program, Melissa Nicolas.  *Id.*, Ex. C.  While Plaintiff states that she incorporated Heifferon's proposed changes to the syllabi, *see* Housel Decl. ¶22, it is undisputed that Plaintiff refused to meet with Heifferon, and requested that Heifferon no longer communicate with her by e-mail.  Housel Tr. 124-28.

In March 2008, Heifferon sent Plaintiff a warning letter indicating that she would be subject to non-renewal for the following academic year if she continued to refuse to cooperate with Heifferon.

Next, Plaintiff's 2007-08 Annual Review indicated that Plaintiff's syllabi in fall 2008 "continued to show fundamental problems that were called to her attention last year," and emphasized Plaintiff's unwillingness to communicate with Heifferon.  Heifferon Decl., Ex. L. Dean Ulin's letter notifying Plaintiff of her non-renewal explained that the decision was based on Plaintiff's "poor performance and insubordination" to her immediate supervisor.  Ulin Decl., Ex. A.  The letter also pointed out that Plaintiff's negative 2007-08 Annual Review was due, in part, to Plaintiff's misuse of class time and unresponsiveness to amending her syllabi as suggested by Heifferon.  *Id.*  These are clearly legitimate, non-discriminatory reasons for Plaintiff's non-renewal.  *See Holt v. KMI-Continental, Inc.*, 95 F.3d 123 (2d Cir. 1996) (legitimate reasons for employee's termination included complaints by clients, failing to take direction from supervisors, and being disruptive);  *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561 (S.D.N.Y. 2010) (employer articulated legitimate nondiscriminatory reason for terminating

employee where termination was based on employee's failure to improve his performance, and employer supplied to employee several reports and warnings providing negative feedback); *Jenkins v. N.Y.S. Banking Dep't*, Nos. 07 Civ. 6322 & 11317, 2010 WL 2382417, at *12 (S.D.N.Y. Sept. 30, 2010) ("[T]he defendant provided a non-discriminatory reason for the second unsatisfactory performance evaluation. This evaluation was given after the plaintiff had engaged in insubordination and misconduct by refusing to follow directives from her superior officers, resulting in her administrative leave. . .").

### 3.     Pretext

Plaintiff also has not demonstrated a triable issue of fact as to whether Defendants' proffered reasons are pretextual.

As stated earlier, to defeat summary judgment at this stage of the *McDonnell Douglas* analysis, Plaintiff must show more than the possibility of retaliatory animus; she must adduce sufficient evidence to permit a reasonable jury to find that "but-for" defendants' retaliatory bias, she would not have been terminated. *See Nassar*, 133 S.Ct. at 2528 ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."). The same standard applies to claims under NYSHRL. *Weber v. City of N.Y.*, --- F. Supp. 2d ----, 2013 WL 5416868, at *24 (E.D.N.Y. Sept. 29, 2013).

Here, the evidence shows that she and Heifferon had a contentious relationship almost immediately after Heifferon became Chair of the English Department. It does not, however, raise an issue of fact that Heifferon's and RIT's retaliatory motives played a part in the adverse employment actions against her, under either the *Nassar* standard requiring "but-for" causation or the former, less-stringent standard requiring Plaintiff to show that the employer's decision was "motivated, at least in part, by an intent to retaliate against him." *El Sayed,* 627 F.3d at 932.

As evidence of pretext, Plaintiff offers the following for the Court's consideration: (1) Heifferon's derogatory comments about Plaintiff's disability; (2) the fact that Heifferon conducted Plaintiff's 2007-08 Annual Review after she had stepped down as Chair; and (3) that Plaintiff's previous performance reviews had been positive until Heifferon's tenure as Chair. Pl. Mem. 19-20.

First, Plaintiff states that Heifferon made inappropriate comments to her on December 5, 2007 regarding her disability, including : "(1) you do not seem to need your walker; (2) why is your eye hyper extended?; and (3) you are not really a cancer patient and not truly disabled." Pl. Mem. 20; Housel Aff. ¶8. Heifferon denies making any such statements. Heiferon Decl. ¶¶17, 26-27. Resolving all ambiguities in Plaintiff's favor, as the Court must, Heifferon's alleged statements, occurring in late 2007 and early 2008, are simply too tangential to Plaintiff's unsatisfactory merit review and non-renewal to raise a material issue of fact. The derogatory comments attributed to Heifferon regarding Plaintiff's cancer and Grave's Disease are insufficient to establish the requisite but-for causation against the overwhelming evidence supporting Defendants' nondiscriminatory reason for her termination, i.e., insubordination and poor performance.

The record is wrought with e-mails drafted by Plaintiff in which she exacerbated the conflict with Heifferon by repeatedly disputing Heifferon's findings in her merit reviews, refusing to meet with her, and refusing incorporate the requested changes to her course content. Plaintiff contends that her non-compliance stemmed from her attempts to protect herself from Heifferon's verbal harassment. *See* Housel Tr. 125 ("I told her not to e-mail me with harassing comments, yes. She was affecting my health in a negative way and I couldn't continue.") However, there is nothing in this voluminous record indicating that Heifferon ever e-mailed

Plaintiff in a harassing manner, nor is there anything from Heifferon mentioning Plaintiff's disability, anywhere.

The record reflects Heifferon's attempts to assist Plaintiff in improving her course content a year prior to the adverse employment actions alleged here. Thus, Plaintiff was advised of what she needed to improve and was given a year to do so. Plaintiff has not shown why this substantial record should be considered merely a pretext for retaliatory motives. *See Desir v. City of N.Y.*, 453 Fed. App'x 30 (2d Cir. 2011) (Title VII retaliation claim failed where, despite short period of time between plaintiff's complaints and adverse employment actions, defendants had actually documented their dissatisfaction with teacher's performance beginning well before he filed his complaints).

Second, Plaintiff submits as evidence of pretext the fact that Heifferon volunteered Plaintiff's 2007-08 Annual Review after she had stepped down as Chair of the Department. This is not probative of discriminatory intent, as Heifferon also elected to write reviews for at least six other colleagues that she previously supervised during Santana's transition into the Chairperson position. Housel Aff. ¶56. Plaintiff therefore does not establish that she was targeted or singled out by Heifferon in this regard.

Finally, the fact that Plaintiff feels as though her unsatisfactory 2007-08 Annual Review was "contrary to [her] previous merit reviews of 'outstanding' for the 2006 academic year and 'very good' for the 2005 academic year," does not demonstrate that Heifferon's negative reviews of her performance were a pretext for retaliation. It is well-settled that an employee's personal disagreement with a supervisor's performance review is insufficient to preclude summary judgment on the issue of pretext. *See Shabat v. Billotti*, No. 96–7638, 1997 WL 138836 at *2 (2d Cir. Mar. 18, 1997) ("[T]he fact that an employee disagrees with an employer's evaluation of him does not prove pretext.") (unpublished, citation omitted); *see also Iverson v. Verizon*

*Communications*, No. 08 Civ. 8873(SAS), 2009 WL 3334796 at *5 (S.D.N.Y. Oct. 13, 2009)

("Merely disagreeing with a supervisor's assessment of work performance, however, is

insufficient to raise a triable issue of fact regarding pretext.") (citation and internal quotation

marks omitted)); *Revere v. Bloomingdale's, Inc.*, No. 03 Civ. 5043, 2006 WL 3314633, at *8

(E.D.N.Y. Nov. 14, 2006) (plaintiff cannot establish pretext by blaming her job performance on

"[d]efendant's discriminatory agenda").   Moreover, a shift in management may lessen the

inference of pretext "when a new supervisor is appointed, who is entitled to set his own

standards and agenda." *Brown v. Time, Inc.*, No. 95 Civ. 10081, 1997 WL 231143, at *12

(S.D.N.Y. May 7, 1997) (citing , *inter alia*, *Beers v. NYNEX Material Enters. Co.*, No. 88 Civ.

0305, 1992 WL 8299, at *11 (S.D.N.Y.  Jan.13, 1992)) ("[A] new manager is allowed to

appraise an employee's work according to his or her own expectations, even if those

expectations are contrary to a prior manager's expectations.").

Here, it is undisputed that Plaintiff and Heifferon had a contentious relationship from the

outset.  While Heifferon may have made unprofessional remarks and had difficulty

communicating with certain members of the English Department faculty, nothing indicates that

her strained relationship with Plaintiff was motivated by retaliation.  Housel Decl., Ex. G.  The

evidence here shows that the English Department at RIT had a history of internal dysfunction

which carried over after Heifferon's appointment as Chair in the summer of 2007.  This

departmental dysfunction intensified in the relationship between Heifferon and Plaintiff.  Housel

Decl., Ex. H; Ulin Decl. Ex. H.  Indeed, Plaintiff's own comments during a meeting she tape-

recorded between herself and Deans Ulin and Capps on October 14, 2008 tends to undercut any

pretext for retaliatory motivation:

> I think that this has to do with some kind of political card that I
> can't name because I don't have my pulse - - I'm not an in - - I'm
> not on the in crowd here; I don't know what's happening.  I'm a
> lecturer and I'm treated like an outsider.  I can't tell you what's

> happening with people; all I know is I'm seeing a pattern here of
> behavior . . . I feel like this has happened twice in the last three
> years. It's not a coincidence that this keeps happening. If I'm to
> stay here, it's going to keep happening. I need protection from
> this, that's what I need."

Clemens Decl., Ex. E 20-21, 27.

Plaintiff further acknowledged, later in the conversation, "Barbara, I think, is sort of a representative of another problem that may or may not have anything to do with my handicap; it's just the way that Barbara translated it that's rather unfortunate." *Id.* at 39.

Likewise, the internal investigation of Plaintiff's grievance attributed Plaintiff's claim of a hostile work environment to previous, unresolved "relational challenges" within the English Department under its previous Chairperson. Ulin Decl., Ex. H. The fact that Plaintiff and Heifferon did not see eye-to-eye with regard to Plaintiff's teaching skills, reputation, and qualifications, simply does not provide a cause of action under any of the statutes set forth above. *See Luongo v. St. Paul Travelers,* No. 07 CV11282, 2009 WL 2432374, at *5 (S.D.N.Y. Aug. 7, 2009) ("It is well-settled that the anti-discrimination laws are not intended to serve as a general civility code and that personal animosity is simply not prohibited by these laws.").

For all of these reasons, Plaintiff has failed to raise a triable issue of fact with regard to whether she was retaliated against for her complaints of disability discrimination. The Court therefore dismisses the Amended Complaint with regard to Plaintiff's claims of retaliation.

**F.    Claims against Heifferon in her Individual Capacity**

Plaintiff has also brought suit against Heifferon in her individual capacity. Dkt. ##1, 14. In their motion for summary judgment, Defendants aver that Plaintiff's claims asserted against Heifferon individually must be dismissed. Def. Mem. 30. Although Plaintiff has not addressed this issue in her opposition papers and has arguably abandoned these claims, the Court

nonetheless has evaluated Defendants' arguments and agrees that these claims are subject to dismissal, for the reasons set forth below.

### 1.      ADA and Title VII Claims (First, Second, Third, Fifth Causes of Action)

As Defendants point out, individuals who are not themselves employers are not subject to liability as a matter of law under the ADA or Title VII. *See Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000); *Briggs v. New York State Dept. of Transp.*, 233 F. Supp. 2d 367, 373 (N.D.N.Y. 2002) (collecting cases). Accordingly, Plaintiff's causes of action asserting claims against Heifferon in her individual capacity under the ADA and Title VII are dismissed.

### 2.      FMLA Claim (Second Cause of Action)

With regard to plaintiff's FMLA claims against Heifferon, an individual can face personal liability under the FMLA only if that person is an "employer" within the definition of the statute. *See Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 364–65 (S.D.N.Y. 2012); *Smith v. Westchester Cnty.*, 769 F. Supp. 2d 448, 475 (S.D.N.Y. 2011). The term "employer" in this context can include "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of [the] employer." 29 U.S.C. § 2611(4)(A)(ii)(I); *see also* 29 C.F.R. § 825.104(d).

To determine whether an individual qualifies as an employer so as to justify imposing individual liability under the FMLA, the Court must consider whether the individual "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir.1999) (internal quotation marks and citation omitted). Stated another way, "the Court must determine whether [the] named individual defendant controlled in whole or in part [p]laintiff's rights under

the FMLA." *Smith.*, 769 F. Supp. 2d at 475 (internal quotation marks, alterations, and citation omitted).

Applying these factors to the record on summary judgment in this case reveals that Heifferon was not involved in the day-to-day personnel decisions at RIT related to FMLA leave. Rather, FMLA determinations were made by Unum, a third-party administrator. Heifferon Decl. ¶31; Quinn Decl. ¶6. It is undisputed that Heifferon had no involvement with any personnel decisions relating to Plaintiff's requests for FMLA leave, nor did Heifferon control the decision whether to renew Plaintiff's contract with RIT. Heifferon Decl. ¶30; Ulin Decl. ¶15. In the absence of any contrary showing by Plaintiff, no rational juror could find Heifferon controlled in whole or in part plaintiff's rights under the FMLA. *Smith*, 769 F. Supp. 2d at 475. Accordingly, Plaintiff's FMLA claims against Heifferon in her individual capacity are dismissed.

### 3.   NYSHRL Claims (Fourth and Sixth Causes of Action)

The NYSHRL, in contrast, provides for individual liability, where a defendant has "an ownership interest," or "the authority to 'hire and fire' employees," under a theory of direct liability; *see* N.Y. Exec. L. § 296(1); *Edwards v. Jericho Union Free Sch. Dist.*, No. 11–CV–3261, 2012 WL 5817281, at *7 (E.D.N.Y. Nov. 16, 2012); *see also Scalera v. Electrograph Sys., Inc.*, No. 08–CV–0050, 2012 WL 991835, at * 14–15 (E.D.N.Y. March 26, 2012) (noting the circumstances under which individuals may be liable under NYSHRL), or where a defendant "actually participates in the conduct giving rise to a discrimination claim," as an aider or abettor. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, (1998), *see also Tully–Boone v. North Shore–Long Island Jewish Hosp. Sys.*, 588 F. Supp. 2d 419, 425–26 (E.D.N.Y. 2008). Each theory of liability is discussed in turn below.

### a.    Individual Liability as Employer

In *Patrowich v. Chem. Bank*, 63 N.Y.2d 541, 542 (1984), the New York Court of Appeals set forth a two-part test to determine whether an individual with the title of supervisor or manager may be held individually liable as an "employer" under § 296(1). According to *Patrowich*, an individual may be held individually liable as an employer if he has (1) an "ownership interest" in the company or (2) "any power to do more than carry out personnel decisions made by others." *Id.* The four factors a court may consider under the second prong of the *Patrowich* test include whether the individual had the authority to hire and fire employees, supervised and controlled employee work schedules or employment conditions, determined payment rate and method, and maintained employment records. *Id.* at 544; *Maher v. Alliance Mortg. Banking Corp.*, 650 F. Supp. 2d 249, 260 (E.D.N.Y 2009).

The undisputed record evidence establishes that Heifferon did not have an ownership interest in RIT, and, as stated earlier, Heifferon had no authority to hire and fire employees, determine compensation, or maintain employment records. While Heifferon was responsible for supervising and evaluating the teaching faculty within the English Department at RIT, she did not make personnel determinations. Heifferon Decl. ¶¶5, 30, 31; Ulin Decl. ¶3.

Plaintiff therefore cannot establish Heifferon's individual liability on the basis that she acted as Plaintiff's employer.

### b.    Individual Liability as Aider and Abettor

NYSHRL also makes it unlawful "for any person to aid, abet, incite, compel or coerce" prohibited acts under the statute. *See* N.Y. Exec. Law § 296(6). Importantly, aiding and abetting "is only a viable theory where an underlying violation has taken place." *Falchenberg v. N.Y. State Dep't of Educ.*, 338 Fed. App'x 11, 14 (2d Cir. 2009); *Nicholson v. Staffing Auth.*, No. 10–CV–2332, 2011 WL 344101, at *2 (S.D.N.Y. Feb. 1, 2011) ("A predicate requirement of aider-

and-abettor liability is a finding of primary liability as to the employer."); *Bennett v. Progressive Corp.*, 225 F. Supp. 2d 190, 213 (N.D.N.Y. 2002) ("In order to hold an individual liable under [the aiding and abetting provision], ... plaintiff must also show that the individual aided or abetted a primary violation of the [NYS]HRL committed by another employee or the business itself." (alterations in original) (internal quotation marks omitted)).  Because plaintiff's underlying retaliation claim under NYSHRL has been dismissed or otherwise abandoned, any claim she seeks to assert against Heifferon as an aider and abettor of such alleged retaliatory conduct fails as a matter of law.

Plaintiff's claims under NYSHRL against Heifferon in her individual capacity are dismissed.

## IV.  CONCLUSION

For all of the foregoing reasons, Defendants' motion for summary judgment dismissing the Amended Complaint in its entirety is granted.

IT IS SO ORDERED.

Dated: March 17, 2014
        Rochester, New York

FRANK P. GERACI, JR.
United States District Judge